**Kirby TUCKER, Plaintiff,**

v.

**Walter DICKEY, Gordon Abrahamson, Dennis Nitschke, and James Sherer, Defendants.**

**No. 84–C–653–C.**

United States District Court, W.D. Wisconsin.

July 23, 1985.

Kirby Tucker, pro se.

Sue Kanner, Madison, Wis., for defendants.

CRABB, Chief Judge.

This is a civil case in which plaintiff seeks monetary damages, injunctive and declaratory relief for alleged violations of his rights under the Fourth and Fourteenth

Amendments. The case is before the court on the parties' cross motions for summary judgment. There is jurisdiction over plaintiff's constitutional claims under 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

Defendants have submitted a brief and proposed findings of fact and conclusions of law in support of their motion for summary judgment. In a letter dated March 9, 1985, plaintiff indicated that he was unable to put together a brief and proposed findings of fact without help. I construe this letter as a request for the appointment of counsel. Although I do not believe that appointment of counsel is necessary either to assist plaintiff in presenting his arguments on the cross motions for summary judgment or to aid the court in ruling on those motions, I will give consideration to plaintiff's request after resolving the motions.

From the uncontroverted proposed findings of fact submitted by defendants, I find that there is no dispute as to the following facts.

## FACTS

At all material times, plaintiff was an inmate confined at Dodge Correctional Institution, Waupun, Wisconsin.

At all material times, defendants were employees of the State of Wisconsin, Department of Health and Social Services. Defendant Dickey was the Administrator of the Division of Corrections; defendant Abrahamson was the Superintendent of Dodge Correctional Institution; and defendants Nitschke and Sherer were correctional officers at Dodge Correctional Institution.

On June 7, 1984, certain inmates at Dodge Correctional Institution were told to give urine samples in connection with a study being undertaken by the Division of Corrections. The purpose of the study was to determine whether illicit drugs were being used in Wisconsin correctional institutions and, if so, by how many inmates. The Division intended to use this information to assist it in dealing with the drug problem. The inmates participating in the study were chosen at random from a computer listing. Fifteen percent of the inmates confined in Wisconsin correctional institutions were selected to participate in the study. Defendant Dickey believed that in order to achieve reliable results and a truly random sample it was necessary for every inmate selected to participate.

Plaintiff was one of the inmates selected at random to provide a urine specimen. At approximately 5:00 a.m. on June 7, 1984, defendant Sherer entered plaintiff's cell, awakened him, and gave plaintiff a container and a photocopy of a statement from defendant Dickey. The statement read as follows:

Be advised and assured that the urine sample taken on 6–7 1984 at DCI is for research purposes and will be anonymous. No disciplinary or punitive action will be taken against any inmate because of the results obtained. /s/ Walter J. Dickey

Defendant Sherer told plaintiff that a urine sample would have to be supplied. Plaintiff refused to give a urine sample, and defendant Sherer threatened that if plaintiff refused to do so he would be given a conduct report for disobeying orders.

As a consequence of plaintiff's refusal to give a urine sample, he was issued a conduct report (No. 37928) charging him with violating Wis.Adm.Code § HSS 303.24, Disobeying Orders. On June 8, 1984, defendant Nitschke decided to treat the conduct report as a major offense. Defendant Nitschke indicated on the conduct report that treatment as a major offense was justified under Wis.Adm.Code § HSS 303.68(c). On June 8, 1984, plaintiff was given a copy of the conduct report and a "Notice of Major Disciplinary Hearing Rights and Waiver of Formal Hearing."

On June 18, 1984, a disciplinary hearing was held on the conduct report against plaintiff. At the hearing, plaintiff read a "Statement to Disciplinary Committee," in which he stated *inter alia* that defendant Sherer "informed me that I would have to give a urine sample" and that defendant

Sherer "said that he would have to give me a ticket for not giving a urine sample because he had orders from the captain."[1] The disciplinary hearing committee members found plaintiff guilty of disobeying orders and sentenced him to "5 nights room confinement." The disciplinary committee gave as its reason for its finding of guilt that plaintiff "acknowledged that he refused to give a urine sample as told by the officer."

Plaintiff appealed the decision to defendant Abrahamson. In his appeal, plaintiff contended that it was improper for inmates to be ordered to provide urine samples for research purposes and that he had not been given a direct order. On June 25, 1984, defendant Abrahamson affirmed the finding of guilt and the disposition.

In a letter dated June 12, 1984, to Governor Anthony S. Earl, plaintiff expressed his concerns regarding the propriety of taking urine samples from inmates for research purposes and the fact that his conduct report had been treated as a major offense. Plaintiff sent copies of the letter to defendants Dickey and Abrahamson. In a letter dated July 6, 1984, defendant Dickey responded to plaintiff's letter of June 12. Defendant Dickey advised plaintiff of the purpose of the urine samples, and that refusal of an inmate to provide a sample is considered a violation of Wis.Adm.Code § HSS 303.24 that creates a risk of serious disruption. In a letter dated July 8, 1984, plaintiff repeated to defendant Dickey the concerns expressed in his June 12 letter.

## OPINION

Plaintiff was granted leave to proceed *in forma pauperis* on two claims: (1) the claim that plaintiff's right to privacy under the Fourth Amendment and as a matter of substantive due process was violated by the order to provide a urine sample and by the penalty he received for refusing to provide one; and (2) the claim that plaintiff's due process rights were violated at his disciplinary hearing because of the inadequacy of the hearing record and the insufficiency of the reasons given for treating the charge against plaintiff as a major offense. Defendants contend for various reasons that the alleged conduct did not violate any of plaintiff's constitutional rights, and that even if plaintiff's rights were violated, defendants are not liable. I turn first to the right of privacy issues.

*Right of Privacy*

Defendants contend that an order to a prisoner to submit to urinalysis does not infringe improperly on any interest protected by the Fourth Amendment or the substantive due process right to privacy, although they seem to concede that the taking of a urine sample is a "search" for Fourth Amendment purposes, just as the taking of a blood sample is a search. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Storms v. Coughlin,* 600 F.Supp. 1214, 1217–18 (S.D.N.Y.1984).

Defendants contend, however, that as a prisoner plaintiff had no legitimate expectation of privacy in his person that would be protected by the Fourth Amendment. In making this argument, defendants rely on *Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), in which the Supreme Court held that prisoners have no "legitimate" or "justifiable" or "reasonable" expectation of privacy in their prison cells. *Id.* 104 S.Ct. at 3199–3201. Reasoning that any "subjective expectation of privacy that a prisoner might have in his prison cells. *Id.* 104 S.Ct. at 3199–01. riding needs of security in the prison context, *id.* at 3200–01, the Court deferred to the need of prison officials for "[u]nfettered access" to prison cells in order to prevent inmates from concealing weapons,

---

**1.** Defendants did not propose any findings of fact with respect to the reasons for the disciplinary committee's finding or concerning the plaintiff's statement to the committee. However, plaintiff attached to the complaint copies of the disciplinary committee's decision and of his statement. Defendants have not disputed the accuracy of those documents, and indeed they relied on the documents in their brief. Thus, it appears that there is no dispute as to the contents of the committee's statement of reasons or of plaintiff's statement to the committee.

drugs and other contraband. *Id.* at 3200. The Court concluded, "A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 3201.

Defendants suggest that it is logical to extend the holding of *Hudson* to the instant case, pointing out that the same concern with drug use that led to the urine sampling program in the instant case was identified as a serious concern in *Hudson. Id.* at 3200. However, neither *Hudson* nor any justifiable interpretation of the Fourth Amendment warrants such an extension. *Hudson* neither held nor implied that prisoners have no justifiable expectation of privacy in their persons, *see id.* at 3216 n. 31 (Stevens, J., dissenting); *United States v. Caldwell,* 750 F.2d 341, 343 n. 2 (5th Cir. 1984) (body cavity searches) (dicta); *Storms v. Coughlin,* 600 F.Supp. at 1223–24, and the rationale of the case does not justify a finding that plaintiff lacked any legitimate expectation of privacy in the instant case.

First, the relationship between institutional security and a study to determine the extent and nature of drug use in prisons is considerably less direct and immediate than the relationship between security and the search of an inmate's cell for contraband. Second, while there is an "inherent diminution" in the privacy of a person's surroundings when incarcerated, the "body undergoes no such fundamental change when incarcerated. The surroundings become less private; the body remains the same." *Storms v. Coughlin,* 600 F.Supp. at 1224. The Supreme Court has asserted repeatedly that "prisons are not beyond the reach of the Constitution." *Hudson v. Palmer,* 104 S.Ct. at 3198; *see also Bell v. Wolfish,* 441 U.S. 520 at 545, 99 S.Ct. 1861 at 1877, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1979); *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). That being so, prisoners must

retain at least some limited protection against highly intrusive searches.

It is more difficult to define the extent of the privacy rights retained by prisoners, given the important interest in institutional security and the deference courts must afford to prison officials. *See Bell v. Wolfish,* 441 U.S. at 547, 99 S.Ct. at 1878. In *Wolfish,* the Court held that the basic test is one of "reasonableness." *Id.* at 559, 99 S.Ct. at 1884. The reasonableness test requires in each case

a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* This reasonableness inquiry must be conducted in a spirit of "wide-ranging deference" to prison officials "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and to maintain institutional security." *Id.* at 547, 99 S.Ct. at 1878.

However, there are limits to the general rule of deference that *Wolfish* establishes. In *Beckett v. Powers,* 494 F.Supp. 364 (W.D.Wis.1980), I held that *Wolfish* requires deference only if:

(1) the practice serves the needs of the institution for security, order and discipline; (2) the practice reflects an *informed* judgment of prison administrators; and (3) the practice is not an exaggerated response to legitimate institutional needs. Thus, the *Wolfish* rule of deference does not preclude all judicial review of prison practices. However, it does mean that when the prison practice has a security purpose, there is a heavy burden on those challenging the practice.

*Id.* at 367 (emphasis original) (citations omitted). The question whether deference is required has a crucial effect on the burden of proof. If deference is not required, the government bears the burden of proof, although in the prison context it need show only that the search was reasonable. *See United States v. Lilly,* 576 F.2d 1240,

1244–45 (5th Cir.1978). However, if deference is required, a heavy burden falls on the plaintiff. *Beckett v. Powers*, 494 F.Supp. at 367. Of course, on a motion for summary judgment, the burden is on the movant to establish that it is entitled to judgment in its favor as a matter of law. Thus, it must show that plaintiff could make no factual showing that would support his claims.

Under *Wolfish* and *Beckett*, the first question that must be answered is whether the urine sampling had a security purpose. Defendants contend that it did because its purpose was to produce a study that would be used in dealing with the drug problem in Wisconsin prisons. I am willing to accept the proposition that drugs are a major security problem in prisons both in Wisconsin and throughout the country. *See Hudson v. Palmer*, 104 S.Ct. at 3200; *Storms v. Coughlin*, 600 F.Supp. at 1220 (taking judicial notice of seriousness of drug problem). However, the relationship of the urine sampling program to institutional security must be more closely examined. According to defendant Dickey's affidavit, sampling was to be anonymous, and no prosecutorial action was to be taken based on the results of the samples. Thus, the sampling program would not contribute directly to prison security by apprehending drug users and deterring drug use. Instead, it would contribute only indirectly by improving the usefulness of a study on which future policy decisions would be based.

In this respect, the sampling program at issue in the instant case is different from two sampling programs whose constitutionality has been upheld in reported cases. In *Storms*, the court upheld a random sampling program that was used to apprehend drug users against a challenge that the program was *per se* unconstitutional, although it found unconstitutional some aspects of the way in which the program was applied. *Storms v. Coughlin*, 600 F.Supp. at 1220–24. In *Hampson v. Satran*, 319 N.W.2d 796 (N.D.1982), heavily relied on by defendants, the court upheld a similar program, although it is not clear from the opinion whether the sampling was random.

In both cases, the relationship between the testing program and security was clear and direct.

In the instant case, whether defendants had a substantial security purpose for demanding plaintiff's urine sample depends on whether the testing program itself had a security purpose. Defendants assert that the Division of Corrections intended to use the results of the program in dealing with the drug problem, but they do not offer any information as to how gathering information on the extent of drug use would be used to improve institutional security. It is possible to conceive of ways in which such information might be useful; for example, such a study would have at least academic interest for prison officials, although academic interest alone would not constitute a security purpose and would not justify such an intrusive procedure. However, I do not intend to engage in speculation about what security related purpose the study may have had, or simply assume from defendant Dickey's assertions that the study did have a security purpose. Presumably defendants would be in the best position to inform the court concerning the purpose of the study, but they have been content with stating that they wanted one without saying specifically how the study related to security. Thus, I can make no factual finding concerning the security purpose for compelling plaintiff to give a sample.

The next factor that must be considered in the *Wolfish* analysis is the "scope of the particular intrusion" on personal rights. *Bell v. Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884. In *Storms v. Coughlin*, 600 F.Supp. at 1218–20, Judge Haight found that being forced to give a urine sample was comparable in intrusiveness to a blood test or a body cavity search. I cannot improve on Judge Haight's analysis.

I find urinalysis analagous to a blood test. Although it involves no forced penetration of body tissues, as does a blood test, it does involve the involuntary extraction of bodily fluids. In that sense, if not literally, it is an "intrusion beyond

the body's surface." *Schmerber [v. California]*, 384 U.S. [757,] 769 [86 S.Ct. 1826 at 1835, 16 L.Ed.2d 908]. Further, the "interests in human dignity and privacy," *id.*, at 769–70 [86 S.Ct. at 1835], which concerned Justice Brennan in *Schmerber* are plainly implicated when an inmate is forced to perform in the presence of a prison guard what is ordinarily regarded as a private bodily function. In a way in which having blood extracted could never be, being forced under threat of punishment to urinate into a bottle held by another is purely and simply degrading.

\*    \*    \*    \*    \*    \*

Urinalyses are entitled to the same level of scrutiny accorded body cavity searches. It may, perhaps, be debated whether one type of search offends "human dignity and privacy," *Schmerber*, 384 U.S. at 770 [86 S.Ct. at 1835], more than the other, but the difference is a matter of degree, not kind. Both are degrading. It is this basic offense to human dignity, rather than any particular style of causing offense, which sets this type of search apart from traditional types.

*Id.* at 1218, 1220.

Given the conclusion that the need for the sampling program was relatively less than in the cases in which similar programs have been upheld, and that the scope of the intrusion on plaintiff's privacy was significant, more importance attaches to the question whether the decision to conduct mandatory sampling was entitled to deference. I accept defendants' assertion that the practice reflected an informed decision because it is undisputed that defendant Dickey decided to undertake the mandatory testing program only after giving some consideration to the need for a mandatory testing program.

However, for the same reason that it is difficult to tell whether there was a substantial security purpose for the mandatory testing, it is difficult to tell whether the testing was an "exaggerated response" to the problem. *Beckett v. Powers*, 494

F.Supp. at 367. To the extent that there was a security purpose for the testing program, and to the extent that a truly random sample was necessary for the study to serve its security purpose, mandatory testing was reasonable and not an "exaggerated response." Yet, it is precisely those points on which defendants have provided only assertions in place of evidence. I conclude that there are factual disputes which make it impossible to decide on a motion for summary judgment whether the decision to make the testing mandatory was entitled to deference. Therefore, I am unable to grant summary judgment to either party on the issue whether the testing program as a whole was unconstitutional.

Moreover, even if mandatory testing was constitutional, there may have been a violation of plaintiff's rights if the manner of conducting the test was unreasonable. *Schmerber v. California*, 384 U.S. at 768, 86 S.Ct. at 1834; *Storms v. Coughlin*, 600 F.Supp. at 1221–24. There is no dispute about the manner in which the testing was conducted in the instant case. No prior notice was given to plaintiff that a test was to be conducted. No prior effort was made to inform plaintiff that the tests were to be conducted, that procedures were in place to ensure anonymity, that test results were not to be used in disciplinary proceedings, or that the purpose of the tests was research. Instead, defendant Sherer entered plaintiff's cell at or around 5:00 a.m., a time when it might be anticipated that most inmates would be sleeping, awakened plaintiff, and handed him a slip of paper with a photocopy of a statement from defendant Dickey that the tests would be anonymous and would not be used for disciplinary proceedings. It was only when plaintiff resisted giving the sample that he was told it would be mandatory.

Defendants have offered no justification for this manner of proceeding. Prior notice would have reduced the fears of inmates that the sampling would not be anonymous, and could have been used to explain the purpose of the testing program to the prisoners, to inform them that a

substantial number of their fellow inmates would also be giving samples, and to inform them of the mandatory nature of the testing and the reasons for mandatory testing. It is noteworthy that in both the cases in which random sampling was upheld, inmates were given prior notice of the existence of the testing program. *Storms v. Coughlin*, 600 F.Supp. at 1216; *Hampson v. Satran*, 319 N.W.2d at 797 (inmates notified a day in advance that they would be tested). If North Dakota found it feasible to notify inmates a day in advance of testing when the results were to be used for disciplinary purposes, it is difficult to conceive of a reason why advance notice could not have been given in the instant case. Defendants have offered none.

The lack of advance notice was compounded by the manner in which the sampling was conducted. Plaintiff was awakened from sleep, handed a container and a note explaining the proceedings in a very cursory fashion, and told to urinate into the container. There does not appear to have been any reason for conducting the sampling in such a fashion, which could only heighten the offensiveness of an already offensive and intrusive procedure. Defendants have had ample opportunity to explain the manner in which the testing was conducted, but have not attempted to do so. Therefore, there is at least a genuine issue of fact concerning whether the manner in which the testing was conducted violated plaintiff's constitutional rights.

However, I do not believe that it would be appropriate to grant summary judgment for the plaintiff. First, questions of reasonableness are usually determined at trial rather than on a motion for summary judgment. Second, there is insufficient evidence in the record concerning who was responsible for the manner in which the test was conducted apart from defendant Sherer. It may be inferred that defendant Dickey had some responsibility, inasmuch as it appears that defendant Dickey was responsible for the implementation of the testing program as a whole. It might also be inferred from defendant Abrahamson's position as warden of the institution that

he had some knowledge of the manner in which such an unusual procedure was carried out. *Cf. Duncan v. Duckworth*, 644 F.2d 653 (7th Cir.1981). However, such inferences are clearly insufficient to establish personal responsibility as an undisputed fact, and personal responsibility is a requirement for liability under 42 U.S.C. § 1983. *Adams v. Pate*, 445 F.2d 105 (7th Cir.1971).

Defendants argue next that even if plaintiff's constitutional rights were violated, defendants are immune from liability for any injuries suffered by plaintiff under the doctrine of good faith or qualified immunity. Under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), government officials are entitled to immunity from damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Insofar as possible, judges are to determine in advance of trial whether the law that an official was found to have violated was "clearly established at the time an action occurred." *Id.*

Defendants contend that there were no cases prior to June 1984 that clearly established that the mandatory testing program violated plaintiff's constitutional rights. It is true that in June 1984, there were no reported cases dealing with a urine testing program for research purposes of the type involved in the instant case. In what was apparently the only reported case dealing with a urine testing program used for disciplinary purposes, a state supreme court had held the program constitutional. *Hampson v. Satran*, 319 N.W.2d 796. However, prior to 1984 it was "clearly established" that highly intrusive searches of the type involved here must meet the "reasonableness" test of *Bell v. Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884. Because of the lack of evidence in the record concerning the purpose of the mandatory testing program, I cannot tell whether it met the *Wolfish* standard in the instant case. Moreover, if the mandatory testing lacked

a security purpose, it may have been so unreasonable that the defendants should have known that it would violate "clearly established" rights. Also, it is possible that defendants should have known that the manner of taking the sample would violate plaintiff's rights. Accordingly, on the present record I must deny defendants' motion for summary judgment on plaintiff's damages claim.

### Due Process

■ Plaintiff was granted leave to proceed against defendants Dickey, Abrahamson, and Nitschke on claims that they either participated in or acquiesced in violations of his right to due process in connection with the hearing on the disobeying orders charge against plaintiff. Petitioner contends that the hearing violated due process in several respects.

First, plaintiff contends that his right to call witnesses was violated. Defendants point out that none of them directly participated in the alleged events that culminated in plaintiff's not being allowed to call witnesses. Defendants also point out that plaintiff failed to raise this issue in his appeal to defendant Abrahamson, or in his letters to defendant Dickey and Governor Earl. The concept of *respondeat superior* liability does not apply to actions under 42 U.S.C. § 1983, and consequently plaintiff must show that each of the defendants was personally involved in any violation of his right to due process in order to recover damages. *Adams v. Pate*, 445 F.2d 105 (7th Cir.1971). Since there appears to be no genuine factual dispute concerning the personal involvement of the defendants, defendants will be granted summary judgment on this claim.

■ Plaintiff contends next that his due process rights were violated by defendants' failure to justify the treatment of the disobeying orders charge as a major offense. Defendants contend in response that the due process clause is not implicated in a decision to treat a charge as a minor or major offense. In resolving this dispute, I must examine the applicable regulations, as the Supreme Court has held that an inter-

est protected by the due process clause may derive from a state statute or regulation if the regulation combines mandatory language with "specific substantive predicates." *Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983). Under Wis.Adm.Code § HSS 303.-68(3), certain violations are always treated as major offenses. Under Wis.Adm.Code § HSS 303.68(4), the security director is to decide whether to treat other offenses as a major or as a minor offense. Section HSS 303.68(4) provides as follows:

> An alleged violation of any section other than ones listed in sub. (3) *may* be treated as either a major or minor offense. The security director shall decide whether it *should* be treated as a major or minor offense.... In deciding whether an alleged violation *should* be treated as a major or minor offense, the security director *shall* consider the following criteria and *shall* indicate in the record of disciplinary action the reason for the decision based on these criteria: ...

(emphasis supplied).

These provisions give the security director discretion in making the decision to treat the alleged offense as major or minor. However, the mandatory language of the final sentence prohibits the security director from treating as major one of the offenses not listed as major under § HSS 303.68(3) unless the director indicates in the record that he has considered the criteria, and gives reasons for his decision based on the criteria. Therefore, plaintiff had a limited liberty interest in defendant Nitschke's compliance with those requirements.

The only indication in the record concerning defendant Nitschke's reasons for treating the alleged offense as a major offense is a notation by defendant Nitschke in the conduct report, "Justify Major 303.-68(3)(c)." Apparently the reference is to current Wis.Adm.Code § HSS 303.68(4)(c), which provides that the creation of a "risk of serious disruption at the institution or in the community" is one of the criteria that would support a decision to treat a violation as a major offense. This notation indi-

cates that defendant Nitschke did consider the enumerated criteria and gave a reason for his decision based on the criteria, albeit in a very cursory fashion. It would appear that this notation satisfies due process, since the purpose of requiring the security director to give reasons is not to justify his decision, but simply to ensure that he relies on the specified criteria, and not on other criteria not permitted by the regulation. Although I share plaintiff's scepticism concerning whether his refusal to give a urine sample created a "risk of serious disruption," it was within defendant Nitschke's discretion to make the decision he did.

■ Finally, plaintiff contends that the statement of reasons for finding him guilty was inadequate. When an inmate is found guilty on disciplinary charges, the hearing body must provide a sufficiently detailed statement of its reasons in order for a reviewing court to determine whether its actions were arbitrary and capricious. *Wolff v. McDonnell*, 418 U.S. 539, 565, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974); *Chavis v. Rowe*, 643 F.2d 1281, 1287 (7th Cir.1981). Ordinarily, this requires the hearing body to do more than give a conclusory statement that it accepts the conduct report or that it disbelieves the inmate. Instead, it must indicate specifically what evidence it relies on and why it discounts the inmate's evidence. *Redding v. Fairman*, 717 F.2d 1105, 1114–15 (7th Cir. 1983). However, if the inmate's testimony does not contradict the report, then the hearing body's statement of reasons does not need to be as detailed. *Id.* at 1115–16.

■ The disciplinary committee gave as its reason for the decision that plaintiff had "acknowledged that he refused to give a urine sample as told by the officer." At times plaintiff has contended that he was not given a direct order by defendant Sherer. However, in a "Statement to Disciplinary Committee" which plaintiff read at his hearing and which he attached to his complaint, plaintiff stated that defendant Sherer "informed me that I would have to give a urine sample" and that defendant Sherer "said he would have to give me a ticket for

not giving a urine sample because he had orders from the captain." Under Wis.Adm. Code § HSS 303.24(1)(a), any inmate who disobeys a "verbal or written order from any staff member" is guilty of the offense of disobeying orders. On the basis of plaintiff's statement, the disciplinary committee could have found that plaintiff had admitted refusing to obey an order, and the statement of reasons adequately reflects that finding. Accordingly, defendants will be granted summary judgment on this claim as well.

*Appointment of Counsel*

■ Under 28 U.S.C. § 1915(d), when a party has been granted leave to proceed *in forma pauperis* the court may request an attorney to represent the party. Section 1915(d) does not require that counsel be appointed for every person who is unable to pay a lawyer, and Congress has not provided the funds necessary to compensate a lawyer who might agree to represent plaintiff. There are not enough lawyers who can absorb the costs of representing persons on a voluntary basis to permit appointment of counsel for all who request it. However, appointment of counsel may not be denied for lack of funds; the request must be considered in light of the circumstances of each case. *Maclin v. Freake,* 650 F.2d 885 (7th Cir.1981).

■ Factors that should be considered include whether the plaintiff's claims have colorable merit, the plaintiff's ability to investigate the facts and present the case, the nature of the evidence (and whether counsel would be necessary to elicit the truth), and the complexity of the legal issues involved. *Id.; McKeever v. Israel,* 689 F.2d 1315, 1320–21 (7th Cir.1982).

In the instant case, plaintiff's right of privacy claims clearly have sufficient merit to survive a motion for summary judgment. The factual issues remaining in this case concern primarily defendants' reasons for initiating the testing program and for the manner in which the testing was conducted, as well as the responsibility of the individual defendants. Pretrial discovery

would undoubtedly be of substantial benefit in eliciting the facts relevant to these issues. Plaintiff has failed even to attempt such discovery up to this point, and his letter of March 9, 1985, indicates that he may have insufficient understanding of legal and procedural matters to do so effectively. Finally, the legal issues involved are novel, although not extraordinarily complex. It is probable that both plaintiff and the court would benefit if all parties were represented by counsel. Accordingly, I will grant plaintiff's motion for appointment of counsel.

## ORDER

IT IS ORDERED that:

(1) plaintiff's motion for summary judgment is DENIED.

(2) defendants' motion for summary judgment is DENIED with respect to plaintiff's Fourth Amendment and right of privacy claims, and GRANTED with respect to plaintiff's due process claims;

(3) plaintiff's motion for appointment of counsel is GRANTED.